**E-FILED**
Tuesday, 23 September, 2008  10:56:09 AM
Clerk, U.S. District Court, ILCD

# IN THE UNITED STATES DISTRICT COURT
## FOR THE CENTRAL DISTRICT OF ILLINOIS
### SPRINGFIELD DIVISION

| | | |
|---|---|---|
| ALAN B. HEIMAN, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | No.  07-3136 |
| | ) | |
| MICHAEL J. ASTRUE, | ) | |
| COMMISSIONER OF SOCIAL | ) | |
| SECURITY ADMINISTRATION, | ) | |
| | ) | |
| Defendant. | ) | |

## <u>OPINION</u>

CHARLES  H.  EVANS, U.S. Magistrate Judge:

Plaintiff Alan Heiman appeals from a final decision of the Social Security Administration (SSA) denying his application for Disability Insurance Benefits (DIB) and Supplemental Social Security Income (SSI) under chapters II and XVI of the Social Security Act, 42 U.S.C. §§ 416, 423, and 1381a.  Heiman brings this appeal pursuant to 42 U.S.C. § 405(g).  The parties have consented to a determination of this case by the United States Magistrate Judge, pursuant to 28 U.S.C. § 636.  <u>Order entered January 29, 2008 (d/e 17)</u>.  The parties have filed cross-motions for summary judgment or affirmance pursuant to Local Rule 8.1(D).  <u>Motion</u>

for Summary Judgment (d/e 12); Motion for Summary Affirmance (d/e 15). For the reasons set forth below, the Court determines that the Commissioner's decision is supported by the law and the evidence. The Commissioner's Motion for Summary Affirmance therefore is allowed, and Heiman's Motion for Summary Judgment is denied.

FACTS

Heiman applied for DIB and SSI on October 20, 2003. He alleged that he became disabled July 6, 2001 based on a combination of discomfort around other people, anxiety, shoulder injury, and neck pain. The SSA denied his claims initially and on reconsideration. Heiman requested a hearing, which was held October 26, 2006. On November 21, 2006, an Administrative Law Judge (ALJ) issued a decision denying Heiman's application. The Appeals Council denied Heiman's request for review, and Heiman now seeks judicial review.

A.    Medical History

On appeal Heiman argues that the ALJ's analysis of his mental disorders was improper; therefore, this opinion focuses on those impairments. In the early 1990s, Heiman was convicted of criminal sexual assault of his 6-year-old daughter. He served more than 3 years in prison.

Heiman denies the abuse took place but alleges that since his incarceration, he has suffered mental impairments.  While incarcerated, Heiman saw psychologist J. A. Raganich.  His treatment notes for August 4, 1992 indicate  that Heiman had "no formalized thought disorders nor emotional defects being noted."  Administrative Record (d/e 10) ®.), at 159.  Two months  later, another correctional institution psychologist, Jason Mabon, diagnosed minor depression.  He noted that Heiman said, "Things keep going around in my head."  R. 161.  Heiman also reported suicidal thoughts and trouble sleeping.  Over the next few months, Heiman continued to report suicidal thoughts and problems sleeping.

On January 8, 1996, Heiman underwent an initial assessment at the Shelby County Community Services Clinical Services Unit.  The assessment states that Heiman was adjusting to life out of prison but trying to stay away from people.

On January 10, 2001, Heiman saw physician assistant Helena Hill. He complained of chest pain radiating into his left arm and numbness.  Hill ordered a series of tests, all of which returned normal results, except for an EKG, which showed marked sinus bradycardia.  She referred Heiman to a doctor.

Dr. Brian Miller examined Heiman January 30, 2001.  Heiman complained of constant chest pains starting around December 1, 2000.  Dr. Miller noted that two separate x-rays, stress tests, EKGs, and laboratory tests all failed to reveal any evidence of cardiac etiology.  Dr. Miller recommended Heiman take an anti-inflammatory or Tylenol.  He also noted "possible depression."  R. 336.

On July 7, 2001, while moving a staircase at his job constructing counter tops, Heiman injured his right shoulder.  He has not worked since this date.  Dr. Michael Trice diagnosed Heiman with rotator cuff syndrome, and on January 14, 2002, Dr. Trice performed surgery.

Heiman saw Hill again on September 17, 2001 and told her that he was depressed, and the depression was getting worse because he could not work.  Hill noted,

> He states he is always used to being very active and holding his place as the man in the family.  Now as he sits home and is unable to work, he has lost joy in doing things.  He doesn't want to go out of the house.  All he wants to do is sit on the couch. He states all he does is sleep all the time.

R. 436.  Hill prescribed Zoloft.

More than a year later, on October 29, 2002, Heiman saw Hill again. He said he was suffering three or four anxiety attacks a day.  Hill noted,

4

"We went through this about 2 years ago with the patient.  We did a complete cardiac workup that was normal.  The patient continues to say that when he has them it feels like he is SOB, his heart is racing, feels dizzy, and then it eventually goes away."  R. 430.  Hill diagnosed "Panic/Anxiety Disorder" and prescribed Xanax.  R. 430.

Five months later, on March 26, 2003, Heiman returned to Hill complaining of anxiety again.  She noted, "Patient says that he has been on melatonin, Valerian, and several other herbs which he feels was working for him as long as he was home, but now that he is out in the work field, he is beginning to experience episodes of anxiety again."  R. 428.  Hill diagnosed generalized anxiety disorder and prescribed BuSpar.  She did not explain her reference to the "work field."  On May 2, 2003, Heiman told Hill that the BuSpar worked well for him except that it did not eliminate the pain in his chest.  Hill diagnosed midepigastric pain and generalized anxiety disorder.

Heiman returned to Hill's clinic July 8, 2003 and met with another physician assistant, Keith Ballinger.  He told Ballinger he had experienced a headache for the past week and believed it might relate to a bulging disk in his neck.  Ballinger diagnosed tension headaches and asked Heiman to have his past MRI and other diagnostic tests sent over for review.

On November 5, 2003, Heiman saw Ballinger again. He reported that he had been outside dragging trees and running a chainsaw to cut wood and the next day woke up barely able to move his right shoulder. Heiman also stated that the BuSpar did not seem to be working anymore. Ballinger advised Heiman to increase his BuSpar dosage.

Heiman saw Ballinger again December 1, 2003. He complained of anxiety and palpitations but indicated that as long as he stays home he "does okay." R. 422. He also indicated that the increased BuSpar seemed to be working "quite well." R. 422. Heiman expressed concern over heart palpitations and indicated that they occur more often when he is out in public.

Stephen Vincent, PhD, met with Heiman December 18, 2003 to perform a mental health assessment for the SSA. Vincent reported that throughout the examination, Heiman rocked "secondary to anxiety," displayed "noticeable tremors of his hands" and "appeared to be quite anxious, apprehensive and ill at ease." R. 394. Heiman told Vincent that he had never been comfortable around people and had ongoing problems with anxiety and depression, particularly when outside the home or under stress. Vincent noted:

6

Clinically, he presents with avoidant personality traits as well as is quite anxious and nervous to the point he does seem rather guarded and seems rather overreactive to rather innocuous situations and noises to the extent he seems rather anxiously hypervigilant.  Interpersonally, he indicates a long history of social anxiety and distrust in others to the point where he maintains distance and privacy to avoid contact with others. Cognitively, he is quite distracted and preoccupied by disruptive and often perplexing thought processes in regards to preoccupations with anxiety to the extent it does result at times in irrelevant digressions and ideations that upset his thought continuity and interfere with his ability to communicate with the examiner without rephrasing his responses.  Affectively, he seems rather anguished and tense as referenced above to the point it makes it difficult for him to remain calm and respond to test questions without repetition and simplification.

R. 394-95.

Heiman also told Vincent that he has trouble sleeping, feels insecure at night, useless, worthless, hopeless, and helpless.  He indicated that he has low energy and a poor memory.  Heiman also stated that he prefers to stay at home and sometimes goes weeks without leaving his house.  He denied current alcohol or drug problems but alluded to a history of alcohol abuse.

Vincent diagnosed Heiman with panic disorder with agoraphobia and dysthymic disorder, a depressive mood disorder.  He noted that Heiman had received psychiatric treatment before but failed to respond to psychopharmacological therapy; Heiman was not involved in counseling at

the time of Vincent's examination.

SSA physician Dr. Vittal Chapa also examined Heiman on December 18, 2003. Heiman told Dr. Chapa that he suffers from constant headaches, and Dr. Chapa noted that Heiman "has chest pain due to anxiety." R. 397. Dr. Chapa stated that Heiman was alert and oriented, could answer questions appropriately, and was "in good contact with reality." R. 398.

Phyllis Brister, PhD, reviewed records in Heiman's medical file and completed a psychiatric assessment dated January 27, 2004 for the SSA. Her assessment indicates that Heiman suffers from affective, personality, anxiety, and substance addiction disorders. Specifically, she found evidence of dysthymic disorder, panic disorder with agoraphobia, personality disorder with avoidant features, and a history of drug and alcohol abuse.

Brister also evaluated Heiman's functional capacity. She found that he suffers moderate limitations in activities of daily living, maintaining social functioning, and maintaining concentration, persistence, or pace but that he has suffered no episodes of decompensation. Additionally, she noted moderate limitations in Heiman's abilities to understand, remember, and carry out detailed instructions, maintain attention and concentration for extended periods, work in coordination with or proximity to others

without being distracted by them, interact appropriately with the general public, and accept instructions and respond appropriately to criticism by supervisors.  She found no significant limitation in any other category. Additionally, Brister noted:  "Concentration compromised by anxiety . . . which will limit him to 1-2-step operations of routine, repetitive nature. Would require socially restricted, undemanding, and non-crowded work environment.  Retains ability to adapt to routine."  R. 417.

In March of 2004, Heiman began regular psychiatric and psychological treatment at Shelby County Community Services.   Initially, he met counselor Brian Owens.  Owens found that Heiman had a history of anxiety and possible agoraphobia.  On March 4, 2004, he rated Heiman a 40 on the Global Assessment of Functioning (GAF) Scale.[1]  This score indicates  some impairment in reality testing or communication or major impairment in several areas, such as work or school, family relations, judgment, thinking, or mood.  <u>DSM-IV-TR</u>, at 34. On April 22, 2004, he rated Heiman a 35 on the GAF Scale, which correlates with the same functionality as a 40.  <u>Id.</u>

---

[1]   A GAF score is a clinician's judgment of an individual's overall level of psychological, social, and occupational functioning on a hypothetical continuum of mental health illness.  <u>See</u> American Psychiatric Association, <u>Diagnostic and Statistical Manual of Mental Disorders</u> 34 (4th ed. Text Revision 2000) (<u>DSM-IV-TR</u>).

On August 12, 2004, Dr. E. Knester reviewed Heiman's file and Brister's January 2004 assessment for the SSA. Dr. Knester "affirmed" Brister's assessment "as written." R. 401.

In August of 2004, Heiman began psychiatric and psychological treatment with Dr. Coudary Kavuri and counselor Daisy Cravens. They diagnosed Heiman with generalized anxiety disorder. At the beginning of his therapy, they rated him a 50 on the GAF Scale. This score correlates with serious symptoms or serious impairment in social, occupational, or school functioning. DSM-IV-TR, at 34.

On February 23, 2004, Heiman saw Dr. David Oligschlaeger, an osteopathic physician. Dr. Oligschlaeger diagnosed generalized anxiety and prescribed Effexor XR. He also advised Heiman to get an EKG and a 24-hour monitor to evaluate his palpitations.

In August of 2004, Cravens noted that Heiman was still feeling anxiety and lacked motivation to become involved in anything. On August 11, 2004, Dr. Kavuri diagnosed him with major depression. In September of 2004, Heiman indicated that he avoids any contact with people outside the home. He said that his wife takes care of "the things outside of the home," but he "does things inside and around the home to keep up his share

of responsibility." R. 482. Heiman's wife called the Shelby County Community Services office September 30, 2004 to report that Heiman had suffered "a major panic and anxiety attack." R. 481. She took him to the hospital but said he was just stressed and needed to relax; suicide was not a concern.

In January of 2005, Heiman reported distrust of other people and discomfort in public. He told Cravens that BuSpar had helped him stay calm, but Zoloft only increased his anger. Dr. Kavuri prescribed Lexapro and Geodon on January 26, 2005. Heiman believed his medications were increasing his anxiety, however, and in March of 2005, he told Cravens that he was not taking them. In July of 2005, he told her that he enjoys repairing lawn mowers and the family car but stated that he does not want to market his skills because he would have to deal with people.

In an Adult Diagnostic Assessment begun June 13, 2006 and dated August 1, 2006, Cravens reevaluated Heiman under the GAF scale and assessed him a score of 46. This score correlates with the same level of impairment that a score of 50 does. DSM-IV-TR, at 34. Cravens diagnosed Heiman with major depression with psychotic features, generalized anxiety, and post-traumatic stress syndrome arising from childhood chaos and

trauma.

Heiman told Cravens in September of 2006 that his doctor had prescribed a new medication that helped him to sleep better and improved his mood and attitude significantly. The next month, however, he said that he had reacted poorly to the new medication and was back to feeling anxious.

B.    Initial SSA Decisions

On February 10, 2004, the SSA found that Heiman did not qualify for SSI or DIB benefits.  It held that while the medical evidence in Heiman's file showed that his "condition does cause some restrictions," he could return to his prior work as a hand packer.  R. 52.

On August 23, 2004, the SSA denied Heiman's request for reconsideration.  It again held that his condition caused some restrictions in his ability to function but concluded he was able to return to work as a hand packer.

C.    Administrative Hearing

Heiman's administrative hearing took place October 26, 2005.  He, his wife, and vocational expert Bob Hammond testified.

At the time of the hearing, Heiman was 44 years old, 6 feet tall, 165

pounds, and right-handed.  He lived with his wife and two sons, who were 9 and 5 years old.  Heiman's sole source of financial support was his wife's income.  He stopped school in eighth grade and never obtained his GED. Heiman testified that he cannot read or write well.  He last worked as a counter top maker at a custom cabinet business but was terminated after he hurt his shoulder in the staircase accident.   Before this job, he had loaded trucks, inspected lenses with a lighting company, and worked in an auto body shop.

Heiman testified that he now gets up at 6:30 a.m., gets his sons ready for school and on the bus, and then waits for them to come home.  While he waits, he sits around.  He does not watch much television because noise bothers him.  Sometimes he takes a walk in the yard and plays with his two dogs.  Every once in awhile, he will help clean something if his wife needs help with housework.  Sometimes he does the laundry but usually does not do the dishes, cooking, sweeping, or vacuuming.  Usually one of his boys mows the yard, but sometimes he does.  Heiman testified that he used to cut wood but now the chainsaw bothers him.  He does not care for his car. He last drove the week before the hearing, but testified that he tries to avoid driving.  He can wash himself.

Heiman does not often visit other people, but he has one friend who comes to see him.  He does not belong to any clubs or groups.  Heiman smokes but no longer drinks.  He used to have a problem with drugs but at the time of the hearing had not used them in six or seven years.  He was not taking any prescription drugs at the time of the hearing because while he had tried eight to twelve of them, he had adverse reactions to all.  His tongue would swell up and he would get angry and unstable.

According to Heiman, anxiety keeps him from working.  He gets nervous, jumpy, scared, and sweaty, and he finds it hard to breathe.  Being around people prompts his attacks, and he sometimes has these attacks two or three times a day.  He also hears voices and has trouble sleeping.  He is paranoid about people watching him.  He has trouble concentrating.  He goes through crying spells and mood swings.

Heiman's wife Marla also testified.  She stated that Heiman does not do much around the house.  He sometimes does laundry and maintenance on the cars.  He has trouble concentrating, but he can handle his personal hygiene.  According to Marla, Heiman only leaves the house once or twice a week,  including  the weekly visit to his counselor.  When he is around a group of  people,  he  gets very nervous and edgy, starts having chest pains,

and sometimes breaks out in sweats.  He has panic attacks every time he goes out in public.  He is paranoid that someone is watching him or trying to hurt him.  He sometimes hears voices and sounds that do not exist.

The  vocational expert, Hammond, testified as well.  The ALJ posed a series of hypothetical questions regarding a person with Heiman's past work history, education, and age.   First,  she asked whether this individual could return to his previous work if he could perform a limited range of medium, light or sedentary jobs but only one- and two-step procedures and could not interact with the public or coworkers more than occasionally. Hammond testified that he could perform Heiman's prior auto body sander work.     Additionally,  such  an  individual could perform the following representative jobs: hand packer (12,500 such jobs in  Illinois), hospital cleaner (8,000 such jobs in Illinois), day worker cleaner (5,000 such jobs in Illinois), housekeeper (13,000 such jobs in Illinois), hand presser (6,000 such jobs in Illinois), and  lens glass assembler (7,500 such jobs in Illinois).

Yet, if this person could use his right dominant arm no more than occasionally, fewer jobs would be available.  He could not perform the work of a lens glass assembler, hand presser, or hand packer, and about 50 percent of the housekeeper, day worker and hospital cleaner positions would

be unavailable.

Additionally, if this person could have no contact with the public and only occasional contact with supervisors and coworkers, the cleaning positions would be unavailable to him. Finally, if this individual were likely to miss three or more days of work each month, Hammond thought he would not be able to keep any of the jobs discussed.

D.    The ALJ's Decision

The ALJ concluded that Heiman was not disabled under the Social Security Act and issued her decision on November 21, 2006. In reaching this decision, the ALJ followed the five-step analysis set out in 20 C.F.R. §§ 404.1520 & 416.920. The analysis requires a sequential evaluation of (1) whether the claimant is engaged in substantial gainful activity; (2) the severity of the claimant's impairment; (3) whether the impairment equals a listed impairment in Appendix 1; (4) whether the impairment prevents the claimant from doing his past relevant work; and (5) whether the claimant can perform other work, given his residual functional capacity, age, education, and past work experience. 20 C.F.R. §§ 404.1520(a)(4) & 416.920(a)(4); Clifford v. Apfel, 227 F.3d 863, 868 (7th Cir. 2000). The claimant has the burden of presenting evidence and proving the issues on

16

the first four steps.  The SSA has the burden on the last step; the SSA must show that, considering the listed factors, the person can perform some type of gainful employment that exists in the national economy.  <u>Knight v. Chater</u>, 55 F.3d 309, 313 (7th Cir. 1995).

The ALJ applied this analysis to Heiman's request for benefits.  First, the ALJ held that Heiman had not engaged in substantial gainful activity after his alleged onset date of July 6, 2001.  Second, she found that Heiman suffers from the following severe impairments: anxiety disorder, personality disorder, depression, a history of substance abuse, and a right shoulder injury.

Third, the ALJ found that none of Heiman's impairments equaled a listed impairment.  Regarding his mental impairments, the ALJ found that Heiman did not satisfy the requirements of the affective disorders, anxiety related disorders, or personality disorders listings.

The ALJ noted that while Heiman has never been psychiatrically hospitalized, he has received treatment and evaluation for mental illness. In September of 2001, Heiman began taking Zoloft after reporting feelings of depression.  On December 18, 2003, Vincent diagnosed panic disorder with agoraphobia and dysthymic disorder.  On April 22, 2004, Heiman was

diagnosed with panic disorder with agoraphobia and antisocial personality disorder. In psychiatric follow-up on August 11, 2004, he was diagnosed with major depression. BuSpar originally proved effective, but by January 22, 2005, Heiman stated that he was unable to take his medications because of side effects. On June 13, 2006, Heiman was diagnosed with major depression with psychotic features, generalized anxiety, and post traumatic stress disorder. He was assessed a GAF of 46. Based on all of these diagnoses, the ALJ concluded that Heiman met the "A" criteria of the affective disorders, anxiety related disorders, or personality disorders listings.

After finding that Heiman satisfied the "A" criteria, the ALJ concluded that Heiman did not meet the "B" or "C" requirements. In making this assessment, the ALJ considered "the claimant's ability to handle activities of daily living, function in a social setting, maintain concentration, persistence and pace, and whether or not he has experienced repeated episodes of decompensation, each of extended duration." R. 20. She found:

> The claimant demonstrates no more than moderate limitations with respect to activities of daily living, social functioning and maintaining concentration, persistence or pace. Mr. Heiman testified that he lives with is wife and two sons. He stated that on a typical day he gets his boys ready for school and sits around, walks in the yard and cares for his dogs. He does not belong to any groups or organizations. One friend comes to see

him.  He watches very little television.  Mr. Heiman reported that he performs some household chores such as laundry, dishes and vacuuming.  He helps mow the yard and does yard work.  He cuts wood.  Mr. Heiman testified that he is independent with his personal care.  He smokes one-half to 2 packs per day.  The claimant testified that he abused drugs and marijuana in the past, approximately 6 years ago, which would be most recently in 2000.  Mental health reports indicate that the claimant tends to isolate himself, yet he cares for his two sons, lives with his family and visits with a friend.  The claimant told a mental health evaluator on July 26, 2005 that his activities included repair or lawn mowers, the family car and creating toys and/or games for his sons (Exhibit 12F/3).  There is no evidence of any episodes of decompensation.

R. 20.  Thus, the ALJ concluded that Heiman's impairments did not meet the "B" criteria.  Because the ALJ found nothing in the record regarding repeated episodes of decompensation, residual disease process, or an inability to function outside of a highly supportive living arrangement, she held that Heiman did not satisfy the "C" requirements either.

Fourth, the ALJ concluded that Heiman's impairments did not prevent him from doing his past relevant work.  Specifically, the ALJ found that Heiman could still work as an auto body sander.  She concluded that Heiman has the residual functional capacity to perform work at the medium exertional level, which requires the ability to lift and carry up to 25 pounds frequently and 50 pounds occasionally and to walk and stand up for the

greater part of a work day.  Additionally, she found that Heiman is limited to one- or two-step procedures and instructions and should have no more than occasional interaction with the public and co-workers.

In assessing Heiman's residual functional capacity, the ALJ noted that Heiman considered anxiety to be his primary impairment and testified that his anxiety produces episodes involving chest pain, difficulty breathing, and nervousness around others.  She discussed Heiman's cardiac test results from 2001 and 2003 and noted that none revealed evidence of cardiac etiology.  She also stated that Heiman had been diagnosed with depression, anxiety, and personality disorder and prescribed a variety of medications that he stopped taking because of side effects.  The ALJ noted that Heiman had undergone mental health counseling since 2004.

While the ALJ found that Heiman's impairments could produce the symptoms of which he complains, she found that his statements regarding the intensity, persistence, and limiting effect of these symptoms were "not entirely credible."  R. 22.  Specifically, the ALJ found:

> [T]he claimant may experience some pain related to his diagnosed mental and physical conditions; however, he is able to lead a relatively active life style despite his health problems. The claimant testified that he lives with his wife and two sons. He provides care for his children.  He is independent with self

care and engages in activities such as watching some television, performing some household chores, wood cutting, lawn mower repair and maintaining his car.  Mr. Heiman reported that he is visited by a friend, although he tends to avoid being around other people.  The claimant takes no medications, as he says that he has reactions to some of the medications he has tried in the past.  Mr. Heiman had what he characterized as a panic attack at the beginning of the hearing, but he sat down and seemed not in any serious distress while answering questions. . . . The evidence establishes that Mr. Heiman's chest pain is from anxiety attacks, not heart-related problems.  The subjective degree of limitation and pain are not consistent with the medical record or the claimant's reported activities.

R. 23.  The ALJ noted that SSA evaluators concluded on January 27, 2004 and August 12, 2004 that Heiman was capable of simple substantial gainful activity with evidence of no more than moderate limitations of functioning. She also noted that SSA evaluators concluded on February 10, 2004 and August 23, 2004 that Heiman was capable of performing his past work as a hand packer.  The ALJ noted that her opinion was "generally consistent" with the SSA evaluators' opinions, except that she concluded that Heiman has moderate problems with social interaction and thus could have only limited to occasional interaction with the public and coworkers.

 Fifth, the ALJ found that given Heiman's residual functional capacity, age, education, and past work experience, he can perform a significant number of jobs in addition to his previous auto body sander job.  The ALJ

relied on Hammond's testimony that such an individual could work one of the 12,500 hand packer jobs, 8,000 hospital cleaner jobs, 5,000 day worker cleaner jobs, 13,000 housekeeper jobs, 6,000 hand presser jobs, and 7,500 lens glass assembler jobs. Thus, the ALJ found Heiman not disabled.

D.    The Appeals Council

Heiman asked the Appeals Council to review the ALJ's decision. Heiman argued that the SSA physicians' opinions were out of date and that the ALJ ignored evidence of Heiman's social impairments. He argued that the ALJ failed to address the medical evidence in the record and to state with particularity the weight she afforded such evidence. According to Heiman, the ALJ granted the opinion of a non-examining SSA physician more weight than his treating physicians' opinions regarding his mental abilities. Finally, Heiman argued that the ALJ erroneously relied on his failure to take prescription medication in rejecting his allegations of disability. On April 27, 2007, the Appeals Council denied his request for review.

## ANALYSIS

Heiman now asks this Court to find him disabled or remand to the

ALJ for further consideration.  Heiman argues that the ALJ failed to consider any evidence from his treating or examining physicians.  He also asserts that the ALJ should have requested additional opinions from his treating physician or arranged for an updated consultative examination by SSA physicians.  Finally, he argues that the ALJ should not have relied on his daily activities in concluding that he was not disabled.

The Court reviews the ALJ's decision to determine whether it is supported by substantial evidence.  Substantial evidence is "such relevant evidence as a reasonable mind might accept as adequate" to support the decision.  Richardson v. Perales, 402 U.S. 389, 401 (1971).  This Court must accept the ALJ's findings if they are supported by substantial evidence and may not substitute its judgment for that of the ALJ.  Delgado v. Bowen, 782 F.2d 79, 82 (7th Cir. 1986).  The ALJ must at least minimally articulate her analysis of all relevant evidence.  Herron v. Shalala, 19 F.3d 329, 333 (7th Cir. 1994).  The Court must be able to "track" the ALJ's analysis to determine whether the ALJ considered all important evidence.  Diaz v. Chater, 55 F.3d 300, 308 (7th Cir. 1995).

A.    Treating Physicians

First, Heiman argues that the ALJ "fails to use any medical evidence

from any treating or examining physician in coming to her conclusion" that he "was not disabled and . . . only had moderate restrictions with regards to activities of daily living, maintaining concentration, persistence, or pace and social functioning."  Brief in Support of Plaintiff (d/e 13), at 8-9.  A review of the ALJ's decision contradicts his position.

The ALJ specifically addressed the diagnoses of Heiman's treating physicians and counselors: counselor Brian Owens' April 22, 2004 diagnoses of panic disorder, agoraphobia, and antisocial personality disorder; Dr. Kavuri's August 11, 2004 diagnosis of major depression; and counselor Cravens' June 13, 2006 diagnoses of major depression with psychotic features, generalized anxiety, and post-traumatic stress disorder.[2]  She also discusses the results of cardiac tests in 2001 and 2003, the various medications Heiman's treaters prescribed, and the notes of his sessions with mental health counselors.  Based on this evidence, she found that Heiman suffers from several severe mental impairments but that he is capable of performing work at the medium exertional level so long as he is limited to

---

[2]  Note that Cravens' diagnoses are set forth in an Adult Diagnostic Assessment begun June 13, 2006 but apparently completed August 1, 2006.  See R. 527-37 (Exhibit 13F/2-10 in the record before the ALJ).  Citing this document, the ALJ dates the diagnoses to June 13, 2006.

24

one- or two-step procedures and instructions and has no more than occasional contact with the public and coworkers.

None of Heiman's treating physicians' opinions contradict this finding. While the record contains extensive notes from Heiman's physicians and counselors regarding his treatment and diagnoses, the Court can find no opinion from any treating individual regarding Heiman's ability to engage in gainful employment. He argues that his various GAF scores -- all between 35 and 50 -- prove his disability: "Generally anyone with a consistent GAF score of 50 or below is not able to sustain substantial gainful activity." Brief in Support of Plaintiff, at 10. Yet, Heiman provides no medical or legal authority supporting this contention. In fact, courts have found claimants with similar GAF scores capable of substantial gainful activity. See, e.g., Schmidt v. Astrue, 496 F.3d 833, 839 (7th Cir. 2007) (GAF of 55); Bayliss v. Barnhart, 427 F.3d 1211, 1217 n.3 (9th Cir. 2005) (GAF of 40); Turcus v. SSA, 110 Fed. Appx. 630, 632 (6th Cir. 2004) (GAF of 35); Bonilla-Castro v. Astrue, 2008 WL 4186691, at *5 (E.D. Wis. Sept. 9, 2008) (GAF of 41-50). Heiman argues that the ALJ fails to explain the discrepancy between his GAF scores and her conclusion that he is not disabled, but the Court sees no discrepancy. Moreover, while a GAF score

25

may be helpful in evaluating residual functional capacity, it is only a treatment tool, and an ALJ is not required to consider it.  Howard v. Commissioner of SSA, 276 F.3d 235, 241 (6th Cir. 2002).

The Court also notes that Heiman takes issue with the ALJ's reference to the SSA's February 10, 2004 and August 23, 2004 conclusions that Heiman could perform the work of a hand packer:  he contends that the ALJ improperly relied on the opinions of non-examining SSA physicians. Heiman appears to have misunderstood the ALJ's opinion.  The February 10, 2004 and August 23, 2004 conclusions that Heiman could perform the work of a hand packer were not the conclusions of SSA physicians; they were the SSA's initial decisions based on the evidence in Heiman's file.  The ALJ did not rely on these decisions in her opinion; she merely noted that her opinion was generally consistent with them.

B.    Updated Consultative Examinations

Heiman also argues that the ALJ's decision is flawed because she failed to contact his treating physician for more information or to arrange for updated examinations by SSA consulting physicians.  He asserts that the record did not provide the ALJ with enough information to make a decision on disability because he did not begin mental health counseling until after

the SSA physicians provided their opinions, and therefore they could not review his mental health treatment records.   Heiman's argument is misplaced.

First, the Court notes that at the first four steps of the five-step disability analysis, Heiman bore the burdens of production and persuasion. See Knight, 55 F.3d at 313.  "In general, it is the claimant's duty to prove to the ALJ that he is disabled.  To this end, he must bring to the ALJ's attention everything that supports a disability determination, including medical or other evidence relating to the impairment and its effect on his ability to work."  Johnson v. Chater, 969 F. Supp. 493, 506 (N.D. Ill. 1997).  If Heiman thought the record did not provide the ALJ enough evidence to make a decision on disability, he should have raised the issue before she released her opinion.

Second, the authority on which Heiman relies does not support his argument.  In Gister v. Massarani, 189 F. Supp. 2d 930, 935 (E.D. Wis. 2001), the district court noted that an ALJ must make reasonable efforts to re-contact treating physicians for clarification when they provide opinions on issues reserved to the SSA, and the bases for those opinions are not clear to the ALJ.  Here, however, Heiman's treating physicians never provided

opinions on issues reserved to the SSA; they never indicated whether Heiman is capable of returning to substantial gainful activity.

Another of Heiman's cases, Gossett v. Chater, 947 F. Supp. 1272 (S.D. Ind. 1996), is similarly off point.  In Gossett, the district court held that the ALJ improperly discounted opinions from treating physicians because the opinions were expressed in response to leading questions in a questionnaire prepared by the claimant's attorney.  Id. at 1279.  The court held that "if the ALJ found the questionnaires inadequate because they consisted of leading questions, the Social Security Regulations placed an affirmative duty on him to seek clarification or elaboration from the physicians who completed them."  Id.  Here, the ALJ did not discount the opinions of Heiman's treating physicians; indeed, she relied on them in concluding that he suffered severe impairments.   She only had an affirmative duty to seek clarification or elaboration if she found those opinions inadequate.  Because she did not, nothing required her to re-contact these physicians.

Heiman's last case, Johnson v. Chater, 969 F. Supp. 493, is no more helpful.  In Johnson, the court noted that while the claimant bears the burden of bringing to the ALJ's attention everything supporting a disability

determination, the ALJ must ensure that she has a "complete medical history" and has made "every reasonable effort to help [the plaintiff] get medical records." Id. at 506.  If this information does not create "a sufficient basis for making a disability determination, or the evidence conflicts to the extent that the ALJ cannot reach a conclusion, she may seek additional evidence from other sources." Id.

Here, Heiman does not argue that the ALJ lacked a complete medical history or failed to help him obtain medical records he requested.  Indeed, the ALJ repeatedly discussed the findings of Heiman's post-2003 treating physicians, and it does not appear that Heiman ever asked her to arrange for SSA physicians to review these records until after she issued her opinion. He asserts that the evidence from his treating physicians and examiners conflicted with the opinions of the SSA physicians, but he does not explain *how* this evidence conflicts.  Moreover, while Heiman repeatedly states that the ALJ rejected the opinions of treating physicians in favor of those of non-examining SSA physicians, SSA physicians did examine Heiman.  Dr. Chapa and Vincent met with Heiman on behalf of the SSA December 18, 2003, and Dr. Knester and Brister reviewed their reports before offering opinions. Heiman does not argue that his mental impairments worsened after he

began treatment in 2004; indeed, the goal of treatment was to improve impairments.  Thus, Heiman provides no basis for concluding that Dr. Chapa's and Vincent's examinations were insufficient.  The ALJ was under no obligation to request additional consulting examinations or reviews.

C.    <u>Daily Activities</u>

Finally, Heiman argues that the ALJ "overstepped her bounds" by considering evidence of his daily activities in assessing his impairments. <u>Brief in Support of Plaintiff</u>, at 11.  Yet, an ALJ clearly is permitted to consider a claimant's testimony regarding his daily activities when assessing his claim that he cannot work.  Indeed, the SSA regulations explicitly list "your daily activities" as one factor in the assessment of a claimant's impairments. 20 C.F.R. § 404.1529(c)(3)(I).  Moreover, in <u>Luna v. Shalala</u>, 22 F.3d 687, 690 (7th Cir. 1994), the Seventh Circuit considered a claimant's testimony regarding his own activities in assessing his abilities in general and in particular the credibility of his claim that he could not bend or stoop.  The court found that his daily activities demonstrated that he could perform a full range of sedentary work and that his specific claim of an inability to bend or stoop lacked credibility.  <u>Id.</u> at 690.

Alternatively, Heiman asserts that if the ALJ could consider evidence

of his daily activities, such evidence here did not constitute substantial evidence that he can engage in occasional contact with the public and coworkers.  He discusses two cases in which the court found that the daily activities at issue did not support the ALJs' conclusions that these claimants could engage in substantial gainful activity.  See Shramek v. Apfel, 226 F.3d 809, 813-14 (7th Cir. 2000) (a claimant suffering from chronic pain and swelling in her legs who could care for her house and children could not necessarily engage in substantial gainful activity because housework naturally provides flexibility to alternate standing, sitting, walking, and resting, but not all substantial gainful activity does); Burress v. Apfel, 141 F.3d 875, 881 (8th Cir. 1998) (holding that a claimant's occasional ability to engage in housework, drive, visit with others, read, or watch television does not contradict her claim that she suffers from disabling fatigue, lightheadedness, and weakness).  These cases demonstrate that a claimant who can engage in housework is not automatically capable of engaging in substantial gainful activity as well.  In determining claimants' abilities to engage in gainful employment, an ALJ must assess the relevance of their daily activities on a case-by-case basis.  These cases do not stand for the proposition that a claimant's ability to engage in domestic activities is never

indicative of his ability to work.

Here, the ALJ's reliance on Heiman's testimony regarding his daily activities was not unreasonable.  The ALJ acknowledged Heiman's many diagnoses of mental impairments and found that he indeed suffers these impairments, just not to the degree that they make occasional contact with the public and coworkers impossible.  In making this assessment, she explicitly relied on Heiman's testimony that he lives with his wife and two sons, provides care for his children, and visits with a friend, and her observation that despite suffering an alleged panic attack at the beginning of the hearing, he did not seem to be in any serious distress while answering her questions.  The ALJ more than minimally articulated her analysis of the relevant evidence, and the Court can track this analysis.  Moreover, her conclusion does not conflict with any of the medical evidence.  No doctor, including Heiman's own treating physicians, concluded that he could not engage in occasional contact with the public and coworkers.  The ALJ reached her conclusion based on substantial evidence, therefore the Court will not disturb her holding.

THEREFORE, Heiman's Motion for Summary Judgment (d/e 12) is DENIED, and Defendant's Motion for Summary Affirmance (d/e 15) is

ALLOWED.  This case is closed.  All pending motions are denied as moot.

ENTER:    September  23, 2008.

FOR THE COURT:


_____s/ Charles H. Evans_____
CHARLES H. EVANS
United States Magistrate Judge